IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FOSTER L. EVERETTE,

        Petitioner,

v.                                                                       Case No. 24-3217-JWB

DAN SCHNURR,
*in his capacity as warden of the Hutchinson*
*Correctional Facility,*

        Respondent.

**MEMORANDUM AND ORDER**

This matter comes before the court on Foster Everette's petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Respondent has filed a response opposing the petition for writ (Doc. 11), and Petitioner has filed a traverse. (Doc. 14.) The court has reviewed those portions of the state court record which are pertinent to the issues raised in the petition and finds that an evidentiary hearing is not warranted. The petition for writ of habeas corpus is DENIED for the reasons stated herein.

Petitioner was convicted of intentional second degree murder and sentenced to 272 months in prison. In a federal habeas proceeding, the state court's factual findings are presumed to be correct, and Petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Here, Petitioner does not challenge the state court's findings regarding the evidence as discussed below.[1] Accordingly, the court incorporates the Kansas Court of Appeal's version of the facts:

> [Foster Lee] Everette and Andrea Garrison were in a romantic relationship for about two years before her death. While the couple did not live together, Everette

---

[1] Petitioner does challenge a factual finding as to his trial counsel's representation of a trial witness which is discussed *infra*.

1

occasionally spent the night at Garrison's home. Their relationship was notable for frequent discord and arguments.

On January 2, 2015, Officer Robert Breeden was dispatched to Garrison's residence at 11:51 a.m. in response to a report of possible domestic violence. Mariah Lopez, one of Garrison's sisters, had called the police after Lopez and her boyfriend, Mario Comacho, took Garrison to her home and found Everette inside the residence. Lopez did not like Everette and disapproved of the relationship.

An argument ensued between Lopez, Comacho, and Everette. According to Everette, Comacho lunged at him several times with a knife. Lopez testified that Everette was angry during the incident. After Lopez called the police, Everette and Garrison walked across the street to an alley to discuss the matter. When Everette saw the police arrive, he walked to his home. Before leaving, Officer Breeden noted that Garrison was calm and had no visible injuries. Lopez testified that she last saw her sister alive when she left the residence about noon. Of note, at 1:48 p.m. on January 2, 2015, Garrison called the county jail to make arrangements to serve some days in custody.

At about 3 p.m., Lopez returned to Garrison's home. When Garrison did not respond to her arrival, Lopez broke in through the backdoor. Lopez discovered Garrison's lifeless body hanging from a belt attached to a rod in the closet of an empty bedroom. Lopez called the police at 3:38 p.m. to report the incident. She informed responding officers that Everette had killed her sister.

When the officers cut the belt suspending Garrison's body, it slipped from an officer's grasp, and Garrison's head and right side of the body "hit a portion of the closet." Observing Garrison's body, the officers noticed several red marks around her neck, red marks on her upper right arm, and a bruise around her right shoulder. Officer Breeden opined that Garrison had been dead for some time before the officers arrived.

Detective Josh Olson found Garrison's cell phone in her bedroom. The detective examined the phone and noticed that Everette had texted Garrison a series of angry messages the day before she died . . . Later, on January 2, 2015, at about 5 p.m., Everette called the police after he learned that Lopez had reported that he had killed Garrison. At the request of police, Everette went to the police station where he was interviewed by Detective Olson. The interview was recorded and later played for the jury.

During the interview, Everette initially told Detective Olson that he only was at Garrison's house once that day. Everette said that he last saw Garrison at about 12:30 p.m., after the disturbance at her home. Everette allowed Detective Olson to review the call history, texts, and other information contained on his cell phone. The detective noticed that Everette had called Garrison several times at about 1:51 p.m. Detective Olson asked Everette if he returned to Garrison's home when he

2

could not get ahold of her. Everette repeatedly denied returning to Garrison's home after he had left about 12:30 p.m. Instead, Everette claimed that he had spent the afternoon visiting friends and relatives.

Detective Olson then asked Everette if his cell phone's GPS would show that he was at Garrison's home between 2 p.m. and 4 p.m. In fact, the GPS on Everette's cell phone did not show that Everette had been in Garrison's home during the afternoon. The detective suggested there could be an innocent reason for Everette's cell phone to be at Garrison's home during that time period, explaining that Everette could have left his cell phone after the earlier disturbance. In response, Everette said there was no reason why his cell phone's GPS would show he was at Garrison's home during that time.

After examining Everette for injuries, Detective Olson left the interrogation room to further examine and photograph the messages on Everette's cell phone. While Everette was alone in the room, he put his jacket on and said, "Oh, shit" and "Damn." When Detective Olson returned to the interrogation room, Everette informed him that he forgot and that he did, in fact, leave his cell phone at Garrison's home and returned there in the afternoon to retrieve it after making several unsuccessful calls to her about 1:51 p.m. Detective Olson then confronted Everette that his latest account made no sense. According to the detective, "I asked him how he could possibly call her if his phone was there with her." Detective Olson testified that Everette "was silent. He was confused. He didn't really have an answer." Everette denied killing Garrison, and he stated that although she had previously threatened suicide, he did not think she would do it.

Doctor Hubert Peterson, the Seward County coroner, performed an autopsy on Garrison's body and opined that the cause of Garrison's death was "she lost the ability to breathe, because of the ligature around the neck, and it causes asphyxiation, which is loss of the ability to breathe." While Dr. Peterson concluded that Garrison died by strangulation from the belt, he did not opine as to how the strangulation occurred, deferring to the police investigation. The coroner placed the time of Garrison's death at about 2 p.m. on January 2, 2015.

During his examination, Dr. Peterson noted that Garrison had a bruise on the right side of her forehead and various contusions on her lower legs. Laboratory tests indicated the presence of methamphetamine and amphetamines in the body. While processing the scene, Dena Allen, an evidence technician, collected items for testing which included the portion of the belt attached to the closet rod, the closet rod, the portion of the belt around Garrison's neck, a syringe, and Garrison's cell phone. Allen measured the distance between the floor and the closet rod at 6 feet, 5 inches. Allen observed a dresser next to the closet with a drawer halfway open and two shoes under it. Of note, at trial Lopez testified that she and Garrison frequently shared clothing, including a few belts. According to Lopez, the belt used in Garrison's hanging "didn't look like [Garrison's]. It looked large. It looked like it was somebody else's."

3

Eric Moore, a forensic scientist for the Kansas Bureau of Investigation, examined a latent fingerprint on the closet rod and identified it as coming from Everette's right thumb. DNA testing was performed on two portions of the belt, swabs from the interior of the closet, and Garrison's fingernails. On the portion of the belt attached to the closet rod, Moore found DNA consistent with Everette and Garrison's DNA profile. On the portion of the belt around Garrison's neck, Moore found DNA consistent with Garrison's DNA profile and consistent with Everette's known DNA allotype (which included his male family members). Everette's DNA was also found inside the closet door. Everette's DNA was not found underneath Garrison's fingernails. Because investigators suspected that Garrison had a rug burn on her shoulder, the carpet was tested for blood evidence but none was not [SIC] found.

Everette was charged with first-degree murder and a jury trial commenced on November 30, 2015.

At trial, friends and acquaintances testified about their encounters with Everette on the day Garrison died, and the various threatening statements he made about her. Shroy Spradley testified that Everette came over to his house before 2 p.m. While at Spradley's house, Everette was angry and told Spradley that "he was going to strangle [Garrison], put a belt around her neck and make it look like that she had committed suicide."

Jamel Irons, who lived with Spradley, testified that Everette came to Spradley's house at about 1:45 p.m. Irons did not hear Everette state that he was going to strangle Garrison and make it look like she committed suicide. Irons heard Everette say, however, that "he was going to smoke the bitch and everyone else there." After Garrison's death, Irons told Everette that she had been interviewed by the police. According to Irons, Everette told her that she should have told Detective Olson that he was with Garrison the day before she died instead of the day she died.

Doahnte Barner, Everette's neighbor who testified that he considered Everette his brother, testified that he took Everette to Garrison's home about 2 p.m. on January 2, 2015. Barner stated that when he dropped Everette off at Garrison's home he did not see whether he walked to the front door.

In addition to Everette's threatening statements made on the day of Garrison's death, two other witnesses testified to earlier threats made by Everette. Stephanie Jones, Garrison's other sister, testified about a conversation she had with Everette a few days before Garrison's death. According to Jones, Everette said he was very angry at Garrison, he hated her, and he was going to kill her. . . .

The State presented four witnesses to testify about prior incidents where Everette was violent towards Garrison. . . .

4

> Everette testified in his own defense at trial. He acknowledged that his relationship with Garrison was at times "hostile" and the couple "would argue a lot." Everette denied killing Garrison and contended that she had committed suicide. He pointed out that Garrison had just lost her job, needed money for rent, was about to serve jail time, had pending criminal charges, and had troubled relationships. Although Everette acknowledged that his text messages to Garrison sounded bad, he explained that he was being sarcastic and a smart aleck. . . .
>
> Everette testified that when the police arrived at Garrison's home the first time, he threw marijuana out of his pocket before leaving the area. Later, Everette explained that he got a ride back to the alley adjacent to Garrison's home. He did not return to Garrison's home, but he found the marijuana which was in the nearby alley and then ran back to his house. Everette did not recall telling Detective Olson during the interview that he went to Garrison's home to retrieve his cell phone. Everette explained that he said "shit" and "damn" when Detective Olson left the interrogation room because he suddenly realized the marijuana was still in his jacket pocket.
>
> The jury found Everette guilty of second-degree murder. Everette's motion for a new trial was denied. The district court then sentenced him to 272 months in prison.

*State v. Everette*, Case No. 115,645, 425 P.3d 1274 (Table), 2018 WL 4517575, at *1–5 (Kan. Ct. App. Sept. 21, 2018) ("*Everette I*").  Petitioner filed a direct appeal, and the court of appeals affirmed his convictions and sentence. *Id*.  The Kansas Supreme Court affirmed Petitioner's sentence.  (Doc. 1 at 2.)  In 2020, Petitioner filed a K.S.A. § 60-1507 post-conviction relief action with the Seward County District Court.  (*Id*. at 3; Doc. 11 at 3.)  Petitioner received an evidentiary hearing in the district court on some of the grounds he raised in his motion, and the district court denied his motion in October 2022.  (Doc. 1 at 3; Doc. 11 at 4.)  The state court of appeals affirmed the denial of Petitioner's § 60-1507 motion and the Kansas Supreme Court denied review. *Everette v. State*, Case No. 126,047, 549 P.3d 1149 (table), 2024 WL 2873489 (Kan. Ct. App. 2024), *rev. denied* (Sept. 27, 2024) ("*Everette II*").  Petitioner then filed this petition for a writ of habeas corpus.  (*See* Doc. 1, filed Dec. 2, 2024.)

**II.    Standard**

5

Habeas petitions are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Hooks v. Ward*, 184 F.3d 1206, 1213 (10th Cir. 1999). A federal court shall not grant a writ of habeas corpus unless the state's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). A "decision is 'contrary to' a clearly established law if it applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts." *Underwood v. Royal*, 894 F.3d 1154, 1162 (10th Cir. 2018) (quoting *Lockett v. Trammel*, 711 F.3d 1218, 1231 (10th Cir. 2013)). A "decision is an 'unreasonable application' of clearly established federal law if it identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of petitioner's case." *Id*. (quoting *Lockett*, 711 F.3d at 1231).

An unreasonable application of federal law is a higher bar than even an incorrect or erroneous application of federal law. *Wood v. Carpenter*, 907 F.3d 1279, 1289 (10th Cir. 2018) ("Even a clearly erroneous application of federal law is not objectively unreasonable. . . . Rather, a state court's application of federal law is only unreasonable if all fairminded jurists would agree the state court decision was incorrect.") (alterations and quotations omitted)). "[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner's burden is to rebut this presumption by clear and convincing evidence. *Id*. Moreover, a reviewing federal court is bound by the state court's interpretation of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's

interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Petitioner's application states two grounds for relief related to ineffective assistance of counsel: 1) conflict of interest; and 2) failing to admit certain text messages and phone records. A claim of ineffective assistance of counsel in violation of the Sixth Amendment requires Petitioner to show that 1) his counsel's performance fell below an objective standard of reasonableness; and 2) but for his counsel's unreasonable errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). "These two prongs may be addressed in any order, and failure to satisfy either is dispositive." *Grant v. Royal*, 886 F.3d 874, 903 (10th Cir. 2018).

In reviewing the decision by the state court, it is clear that the claims pertaining to ineffective assistance of trial counsel were decided on the merits after an evidentiary hearing. Further, the Kansas Court of Appeals applied the *Strickland* standard in reviewing Petitioner's claims. Because the trial court conducted an evidentiary hearing on the issues relating directly to trial counsel's performance when considering Petitioner's motion, the court finds that an evidentiary hearing is not warranted. Petitioner has not identified what testimony would be presented at a hearing nor has he raised any issue which may be addressed that was not already covered in the evidentiary hearing held by the state trial court. *See Davis v. Workman*, 695 F.3d 1060, 1076–77 (10th Cir. 2012) ("We have said that district courts are not required to hold evidentiary hearings in collateral attacks without a firm idea of what the testimony will encompass and how it will support a movant's claim.")

**III.   Analysis**

Petitioner raises two issues in his application for writ of habeas corpus. First, that his trial counsel had a conflict of interest in representing both Petitioner and Shroy Spradley. Second, that his trial counsel was ineffective for failing to introduce evidence of text messages and phone calls. The court will address the arguments in turn.

### A. Conflict of Interest

A criminal defendant has a constitutional right to representation by an attorney that is free from conflicts of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Petitioner argues that he was deprived of his right to conflict free counsel.

In March 2015, Razmi Tahirkheli was appointed to represent Petitioner. *Everette II*, 2024 WL 2873489, *1. Based on the record below, Petitioner's trial counsel also represented Spradley on unrelated charges until mid-August 2015. Petitioner asserts before this court that Tahirkheli actually represented Spradley until mid-November 2015. Petitioner attached Spradley's docket sheet as evidence. (Doc. 1-3.) According to the docket sheet, new counsel for Spradley did not enter Spradley's case until November 12, 2015.[2] (*Id.* at 8.) Based on this record, trial counsel represented Spradley until approximately two weeks before Petitioner's trial. There is no evidence, however, that Spradley testified in any hearing during the time he was represented by Tahirkheli. Further, Petitioner does not contend nor does the record show that Petitioner objected to the representation.[3] In his briefing to the Kansas Court of Appeals, Petitioner also failed to "explain how any duty Tahirkheli continued to owe Spradley as a former client compromised

---

[2] The court has also undertaken to review the state court's docket sheet that is available online. The exhibit appears to be an accurate reflection of the state court docket.

[3] In his reply, Petitioner makes an assertion that his rights were violated due to Tahirkeheli's false testimony at the state court hearing regarding the dates of representation. Petitioner, however, fails to show that his trial counsel knowingly made false statements at the hearing. Tahirkeheli was attempting to recall his representation of both Petitioner and Spradley which had occurred several years prior. In any event, given that Petitioner and Spradley were not co-defendants in this matter, any dual representation requires a showing of prejudice as discussed herein. Petitioner cannot meet that standard.

Tahirkheli's representation of him in the trial." *Everette II*, 2024 WL 2873489, *4. Rather, Petitioner appeared to rest solely on the alleged conflict from Tahirkheli's representation of Spradley. The Kansas Court of Appeals found that Tahirkheli had a conflict of interest while he represented both Spradley and Petitioner, given what Spradley testified that Petitioner told him at trial about harming Garrison. The court held, however, that Petitioner failed to show prejudice.

The court first addresses the factual discrepancy raised by Petitioner. Petitioner asserts that trial counsel actually represented Spradley until mid-November 2015 instead of mid-August 2015. According to the Kansas Court of Appeals, the dates pertaining to the representation were undisputed by the parties. *Everette II*, 2024 WL 2873489, *4 ("The parties agree that Tahirkheli withdrew from representing Spradley as a defendant in a different criminal case in mid-August 2015.") In review of Petitioner's brief to the Kansas Court of Appeals, Petitioner does not assert that his trial counsel represented Spradley until mid-November 2015, nor is there evidence that the Kansas Court of Appeals was presented with Spradley's criminal case docket sheet. (Doc. 12-19.) Further, the testimony below was that trial counsel was allowed to withdraw in mid-August 2015. In reviewing Petitioner's claim, the court does not consider evidence that was not presented to the court below in ruling on an exhausted claim. *See Eaton v. Pacheco*, 931 F.3d 1009, 1018 (10th Cir. 2019). Therefore, Petitioner cannot establish that the Kansas Court of Appeals' decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). Further, the factual determination that Petitioner takes fault with was not a material determination for the court's decision. Regardless of whether trial counsel had terminated his representation in mid-August or mid-November, the termination was still prior to Petitioner's trial. Therefore, the only material, factual determination for the Kansas Court of

Appeals' decision was the determination that Spradley was a former client at the time of trial. This factual determination is not disturbed by the evidence presented by Petitioner.

Next, the court determines whether the Kansas Court of Appeals' decision was contrary to or unreasonable in light of Supreme Court precedent. In deciding this issue, the Kansas Court of Appeals discussed that both the Kansas Supreme Court and the United States Supreme Court have not clearly identified whether the conflict at issue utilizes the standard of review under *Strickland* or *Cuyler*. The Kansas Court of Appeals essentially held that Petitioner could not meet either standard because he had not shown that the conflict affected the representation at trial. Notably, Petitioner fails to identify the relevant standard for the present matter and fails to make any argument that the Kansas Court of Appeals' determination was contrary to federal law.

Typically, the clearly established law for a claim of ineffective assistance of counsel is the two-prong test in *Strickland*. The United States Supreme Court has identified a different standard for certain cases in which there is a complete denial of counsel or conflicted counsel. In cases where there is an "[a]ctual or constructive denial of the assistance of counsel altogether," prejudice is presumed. *Strickland*, 466 U.S. at 692. A more "limited[] presumption" of prejudice applies "if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected [counsel's] performance.'" *Id.* (quoting *Cuyler*, 446 U.S. at 348, 350). However, as noted by the Kansas Court of Appeals, the Supreme Court has not applied *Cuyler*'s presumption of prejudice to cases that do not involve trial counsel's concurrent representation of multiple defendants in the same proceeding. *Everette II*, 2024 WL 2873489, *3–4; see also Mickens v. Taylor*, 535 U.S. 162, 175–76 (2002)); *Watson v. Fairbairn*, No. 23-1392, 2024 WL 1005070, at *5 and n.2 (10th Cir. Mar. 8, 2024), *cert. denied sub nom. Watson v.*

*Bergman*, 145 S. Ct. 1131 (2025), *reh'g denied*, 145 S. Ct. 2695 (2025) (only "the concurrent representation of multiple defendants creates an actual conflict of interest" under *Mickens*).

The Kansas Court of Appeals then discussed that the Kansas Supreme Court has identified three different tests courts have used to determine an adverse effect on representation, "assuming the *Cuyler* standard rather than the *Strickland* standard were to apply." *Everette II*, 2024 WL 2873489, *4 (citing *State v. Moyer*, 309 Kan. 268, 279-80, 283–84 (2019) (recognizing lack of governing standard)). The Kansas Court of Appeals then identified the three different standards of showing an adverse effect on representation. In this case, the differences between those standards was not material because Petitioner made no argument to show that his trial counsel's representation was "in any way compromised." *Id.* The Kansas Court of Appeals held that Petitioner was not entitled to relief because he could not show that the conflict adversely affected his trial attorney's performance and "failed to show any trial prejudice tied to Tahirkheli's past representation of Spradley." *Id*. at *5.

In his petition in this court, Petitioner fails to address how he is entitled to relief. His claim is not based on concurrent representation of multiple defendants in the same proceeding; therefore, there is no clearly established federal law to be applied under § 2254(d)(1). *See Watson*, 2024 WL 1005070, at *5. Liberally construing Petitioner's filings, it appears he believes that he is entitled to a presumption of prejudice. As discussed herein, that standard does not apply. Further, even if the court would apply *Cuyler's* test to Petitioner's claim, he would not succeed. Petitioner has not established that trial counsel's performance was adversely affected by the conflict of interest.

After review, the court finds that the Kansas Court of Appeals acted reasonably under *Mickens* and *Strickland* in requiring Petitioner to show that the conflict adversely affected his attorney's performance. Further, the Kansas Court of Appeals reasonably concluded that

Petitioner failed to show prejudice. Moreover, in this matter before the court, Petitioner again fails to address prejudice. Rather, he continues to assert that he is entitled to relief due to trial counsel's conflict of interest based on his former representation of Spradley. Petitioner fails to identify how the Kansas Court of Appeals erred in applying the federal law. Rather, Petitioner merely asserts that he never waived the conflict of interest and that it was never addressed while he was present. (Doc. 1 at 5.) Petitioner fails to identify any alleged prejudice due to trial counsel's representation of Spradley. Rather, Petitioner appears to rest on a "mere theoretical division of loyalties" which is not sufficient. *Mickens*, 535 U.S. at 171. Petitioner makes no argument that would indicate that his trial counsel was not able to effectively cross examine Spradley due to his prior representation. *See Church v. Sullivan*, 942 F.2d 1501, 1511 (10th Cir. 1991). Rather, the record shows that trial counsel did cross examine Spradley and questioned him regarding his statements. There is nothing in the record to indicate that trial counsel's representation of Spradley was somehow hindered. The cases were not related and Spradley was not implicated in Petitioner's crime. *See id.* (finding a conflict when trial counsel's theory of defense involved inculpating his former client).

The court concludes that the Kansas Court of Appeals' resolution of Petitioner's Sixth Amendment conflict-of-interest claim was not contrary to, nor an unreasonable application of, clearly established federal law.

### B. Phone Records

Next, Petitioner asserts that his trial counsel was ineffective for failing to have a witness available to lay a foundation for the records of text messages from Garrison and her phone records before her death. At trial, the State admitted some text messages from screenshots taken by officers without objection but did not move for the admission of the phone records that were obtained from the warrant. (Doc. 12-15; *see also* Doc. 12-10 at 129 (discussing that exhibits of text messages

12

were photographs of the text messages taken by the officer)). The admitted messages included Petitioner's statements to Garrison the day before she died that the "cop wasn't bullshiting when he said [I] will kill you," "the games and bullshit will only lead to some terrible shit happening," and "I don't want us to end up as a newspaper article." *Everette I*, 2018 WL 4517575, *2.

The phone records obtained by the warrant and not admitted at trial would have shown that Garrison's phone made three calls to Petitioner's phone between 2:00 and 2:40 which Petitioner argued would have contradicted the time of death at 2 p.m. The text messages at issue contain language "suggesting Garrison was threatening to kill herself or displaying suicidal ideation" which would support the defense theory of her death. *Everette II*, 2024 WL 2873489, *5. During trial, defense counsel moved for the admission of these messages. The government objected on the basis that the officer testifying could not establish the foundation for the messages. The court sustained the objection. The jurors did not see the messages. After trial, counsel moved for a new trial on the basis that the court improperly excluded the exhibits. The motion was denied.

Petitioner raised this issue in the state court collateral proceeding after appeal. Petitioner's trial counsel testified at the hearing on this issue. He testified that he did not have a witness who could establish an evidentiary foundation for the phone records. He made a strategic decision regarding the records to not have a witness to lay a foundation because he was concerned about opening the door for additional messages in the phone records that would be detrimental to the defense. *Id.* He testified that if the government objected then he planned to argue that the State was trying to hide relevant information supporting the defense. He did in fact argue in closing that the government failed to offer the records of the messages even though the State had the records in its possession. In reviewing counsel's strategy, the Kansas Court of Appeals applied the *Strickland* standard and determined that trial counsel's decision was reasonable and did not rise to

13

a violation. The court held that "[g]iven the great deference accorded strategic choices under the *Strickland* standard for assessing constitutional ineffectiveness, we are not prepared to say Tahirkheli's decision lacked an anchor in at least a colorably competent trial tactic to deal with evidence that might wind up both advancing the defense theory in some ways and impeding it in other ways." *Id.* at *6.

The Kansas Court of Appeals correctly identified that strategic choices are accorded great deference. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Anderson v. Sirmons*, 476 F.3d 1131, 1145 (10th Cir. 2007). To rise to the level of a constitutional violation, trial counsel's decisions must have been "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy." *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (internal quotations omitted). Here, trial counsel testified that he made the strategic decision not to lay a foundation for the records in the hopes that the government would not object to the admission of the messages and phone records that could support Petitioner's defense. Trial counsel, however, was concerned about opening the door to the admission of all of the records and testified that there were additional messages that were detrimental to his client. Further, he utilized the objection to the evidence at closing to argue that the State didn't want to admit these records.

After review of the records, there was a message from Garrison in the early hours of January 2 in which she stated that she was going to "leave this hell one way or the other." (Doc. 12-4 at 14.) While this message was not admitted into evidence, there were messages from the previous day where Garrison told her sister that she was alone for New Year's Eve and she didn't like 2015 already. Trial counsel used these messages to argue during closing that she had problems and this led to suicide. The complete text messages from the phone records, however, do portray

Petitioner "as an angry, controlling and jealous person who had an unhealthy obsession with Garrison" and he repeatedly accused her of cheating on him. (Doc. 12-2 at 91; 12-4 at 1–33.) Given the nature of the messages sent by Petitioner, the court cannot find that trial counsel's strategy was unreasonable given his concern that the complete record of text messages would be detrimental to Petitioner if admitted.

With respect to the phone calls, Petitioner asserts counsel was ineffective for failing to introduce the call logs showing that there were calls from Garrison's phone after 2 p.m. on the day of Garrison's death. According to the record, Garrison's phone made three outgoing calls between 2:00 and 2:40 p.m. (Doc. 12-4 at 34.) While the jury heard that Garrison made a call to the jail at 1:48 p.m., the jury did not hear about the calls placed between 2:00 and 2:40 p.m. Notably, these calls were to Petitioner's phone. During this timeframe, however, Petitioner was unaccounted for as he had been dropped off at Garrison's home around 1:50 p.m. Tahirkheli testified that he feared that the calls from 2:00 to 2:40 p.m. could be viewed as Petitioner using the phone after killing Garrison. Therefore, he believed the best strategy was to argue that the State was hiding information from the jury. (Doc. 12-3 at 39–41.) Given the facts presented to the jury, Tahirkheli's decision not to admit the phone and text records does not rise to the level of constitutional ineffectiveness. *See Harrington,* 562 U.S. at 108 ("Even if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it.").

Moreover, even if Petitioner could satisfy his burden of showing deficient performance under *Strickland's* deferential standard, he has not shown prejudice. To show prejudice, Petitioner must establish a reasonable probability that the outcome would have been different. Petitioner makes no attempt to meet this burden. Further, given the evidence at trial, the court finds that he

cannot. There were four witnesses who testified about Petitioner's prior violence against Garrison, Petitioner's own text messages to Garrison indicated that he was contemplating violence the day before she died, Petitioner told two individuals that he was going to kill Garrison just a couple of hours before she died, and evidence that Petitioner was dropped off at Garrison's house shortly before she died. Given this evidence and the fact that the jury clearly considered whether Garrison committed suicide based on the presentation of the defense, Petitioner has not established a reasonable probability that the outcome of the trial would have been different but for counsel's failure to call a witness in order to admit the text messages and phone records.

### IV. Conclusion

For all the reasons stated above, Petitioner's petition for a writ of habeas corpus (Doc. 1) is DENIED. Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to 28 U.S.C. § 2253, this court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court must indicate "which specific issue or issues satisfy the showing." This requires Petitioner to show that this court's ruling was "debatable among reasonable jurists." *Harris v. Sharp*, No. 17-6109, 2019 WL 5541416, at *37 (10th Cir. Oct. 28, 2019) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003)). The court finds that a certificate of appealability should not issue in this case. Nothing in the record suggests that the Tenth Circuit would resolve these issues differently.

IT IS SO ORDERED. Dated this 12th day of December, 2025.

            __s/ John W. Broomes__
            JOHN W. BROOMES
            CHIEF UNITED STATES DISTRICT JUDGE